## In the District Court for the District of Columbia

**FILED**

FEB 1 9 2009

Clerk, U.S. District and
Bankruptcy Courts

| | |
|---|---|
| John P. Halvonik | ) |
| 1517 Gerard St. | ) |
| Rockville MD. 20850 | |
| 301 990 9393 | ) |
| | ) |
| v. | ) |
| | ) |
| John Doll | ) |
| Director US Patent and Trademark Office | ) |
| Crystal Park #2 Ste 906 | ) |
| Arlington VA. 22215 | ) |

Case: 1:09-cv-00326
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 2/19/2009
Description: Admin. Agency Review

## PETITION FOR REVIEW OF ORDERS AS TO ADMISSION OR EXCLUSION OF PRACTITIONERS BEFORE THE PATENT OFFICE

Respondent hereby seeks Review of the U.S. Patent Commissioner's final decision in disciplinary case referred to:  OED File NO. D06-15.  This petition is per Federal regulations at 37 C.F.R. S $($ o. 155 $(d)$ See 35 U S C  section 32 and Local Rule 213 of this court.                                                           83.7

A fee of $350 accompany this petition is attached with that copy given to the clerk.  See attached a memorandum in support of this Petition.

Sincerely

John P. Halvonik
petitioner, pro se

1517 Gerard St.
Rockville MD. 20850
301 990 9393

## In the District Court for the District of Columbia

| | | |
|---|---|---|
| In re John P.  Halvonik | ) | |
| 1517 Gerard St. | ) | |
| Rockville MD. 20850 | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No_____ |
| John Doll | ) | |
| Director US Patent and Trademark Office | ) | |
| Crystal Park #2 Ste 906 | ) | |
| Arlington VA. 22215 | ) | |

### Memorandum in Support of Petition.

**Introduction**.

This court has the power to review the proceedings below, de novo,

for any clear legal error and there was clearly a serious legal error made in

finding the petitioner guilty of commingling of funds. The petitioner does

not wish to contest any of the factual findings below. Nor does he wish to

minimize the problems that his clients had or rely on his own personal

problems as an excuse. The petitioner only wishes to contest that one issue,

whether he violated a fiduciary duty by not placing his client fees into a trust

fund. The ALJ and the Commissioner below found him guilty of this by

relying on the previous case law which is not correct. The petitioner takes

this legal error very seriously and feels very strongly that his reputation

should not suffer any more harm than it has by a gross legal error.

**I. Contrary to the ALJ's initial decision, that decision in <u>Halvonik v Dudas</u>, 398 F Supp. 2d 115. did not say he had to put any fees he collects in trust.**

The ALJ relied on petitioner's previous disciplinary case Halvonik v Dudas; see Director's exhibit 14 (*sub nom*: <u>Halvonik v Bovard; at Director's exhibit 17</u>) to conclude that he violated a fiduciary duty by not putting the fees he had received in these cases into a trust fund.

Nowhere in the District court decision did it mandate that fees/money collected by the Petitioner had to go into a trust fund. Nor did the initial ALJ decision ever suggest that.

What the District court in <u>Halvonik v Dudas</u> decided was not where client fees are to be kept but rather whether there was a bona fide fee dispute and whether Halvonik correctly handled that dispute under the rules of his state bar. The court said Halvonik violated the rules because he:

> "....failed to promptly pay or deliver to the client as requested by a client the funds, securities, or <u>other properties</u> in the possession of the practitioner which the client is entitled to receive" for his failure to return $500 of Palmer's advance payment for the services which he did not tender." [Director's exhibit 4, p. 14; emphasis mine.]

In regards to the funds issue the court said:

> "the gravamen of this issue centers on whether a bona fide fee dispute exists. In this case, the analysis is easy because Halvonik admitted that he owed Palmer at least $500."
> [decision at p. 13;]

The court based it's decision not on the bank account where the fee was placed but the PA disciplinary rule that mandates that the attorney must take reasonable steps to resolve the fee dispute situation.

> "Moreover, Halvonik made no effort to resolve the fee dispute even though the onus is clearly on the lawyer to set in motion appropriate means for resolving such dispute. See e.g. Pa. R.P.C. 1.15 (Comments)." [p. 14 of Halvonik v Dudas, 398 F Supp. 2d 115.]

Thus the court found that Halvonik was not reasonable when he stopped payment on the refund check and this in turn caused a violation of the PTO rules. The court used the PA. disciplinary rule about fee disputes, to see if Petitioner had handled the dispute properly. When Halvonik, a PA. practitioner, violated a PA. rule about resolving a fee dispute, he was being unreasonable under the PA rules and because of that he violated 10.112 part (c)(4) having to do with return of client properties. The District Court's did not make a ruling on where the fees must be placed and the court focused on the stopping of the payment on the check.  In any event, the facts in Sprague and Chess occurred in 2003/04; prior to the issuance of the decision Halvonik v Dudas in Aug. 05.

Neither did the initial, ALJ's decision, in Halvonik v Dudas suggest depositing advance fees in trust. At the conclusion of the trial portion the ALJ had this colloquy:

3

"Mr. Fitzgerald: Step one has to be the rule of client funds...
j. Terrill: I didn't reach that issue [client funds] and quite
frankly, I'm not sure that that artifice needs to be breached
because I think that if in a practitioner's mind he knows that
he owes a client a refund, they are no longer his funds.
Mr. Fitzgerald: That's the basis of your Honor's ruling and...
j. Terrill: That is correct." [Respondent's exhibit 1, p 168
(brackets mine).]

Hence it was the Petitioner's understanding that the issue of client funds

was not on trial but that stopping payment on the refund check to his client

was failing to return client property. The Petitioner read from the ALJ's

initial decision [TR 489] in this trial to further explain the initial decision

and the Petitioner's understanding:

"Contrary to Respondent's efforts to cast this issue as being a
charge that Respondent wrongfully deposited client fees in his
own general account rather than in a trust or client account, I
find no basis for this coloration...The complaint never raised
any matter regarding the type of account which Respondent
used to deposit funds received from his clients. Had such an
allegation been charged, it would have been more likely cited
as a 37 C.F.R. sec. 10. 112 (a) and (b)(2) violations.
Accordingly, there is no need to resolve the jurisdictional
conflict that may be faced by Sperry practitioners involving
PTO's rules of practice and their state bar associations
regarding the type of accounts in which practitioners are
required to deposit funds received from their clients."
[Director's exhibit 17, p 81; p. 72 of the initial decision in
Bovard v Halvonik]

Further on that page of the opinion the court goes on to state:

4

"While PTO has no rule that provides for it to order practitioner
to return to their clients any unearned fees, such does not mean
that PTO is without interest in or authority to review a
practitioner's fee disputes....When a state bar association has not
taken action regarding a fee dispute involving a PTO
practitioners, such inaction does no obviate or preclude the
PTO from reviewing those same facts and circumstances for
purposes of enforcing its own rules of practice." [Director's
exhibit 17:Initial decision at p. 72]

To reach this conclusion the court noted that the check to Palmer

represented a refund to the client. When Halvonik stopped payment on that

check he violated 10.112(c)(4) because he failed to return client property. It

had nothing to do with where client fees are put and the judge said so.  See

p. 73 of the initial decision [Director's exhibit 17, p. 82]:

"There is no dispute that Respondent failed to return
Palmer's money. Respondent himself admitted that Palmer
deserved a return of at least $500 of the fee that she had paid
him. As a result, of Respondent's admission...his failure to
return the $500 was a violation of 37 C.F.R. sec.
10.112(c)(4)...Clearly Palmer had requested that Respondent
refund her entire amount. She even refused to accept his
$500 check..."

Clearly the facts and issues in the earlier disciplinary case are not the

situation in this case and there is no basis to say there is precedent that

advance fees for patent attorneys must be placed in trust. In this case, the

Petitioner has not stopped payment on any refund checks or on any monies

in dispute. Even the PTO's expert conceded that it would be reasonable way

5

to resolve dispute to send another check, even though no actual communications were made. [If] "the fee dispute...is done in essence by sending another check in the full amount" then there might not be a violation. [TR 440-41]

The issue of where fees go is definitely one governed by state law with the understanding that there could be additional federal regulations on the matter, however there is nothing definitive in the PTO regulations that mandate this.

## II. Petitioner had no knowledge that client's fees had to be put into a trust fund.

The petitioner was sent a letter by the PTO (not of record) back in 1992 advising him of fees/funds issues. The petitioner testified (TR 483-490) that he did his own research, read the opinions cited in the letter and came to the conclusion that he could deposit advanced fees from clients into his general operating account under Pennsylvania (PA) disciplinary rules provided that he explained the situation to his clients (See TR p. 486-87.) The petitioner had for many years sent out his 4 pp. information package explaining legal fees, PTO fees, other expenses and other issues to his clients (See Petitioner's exhibit 1 at p. 42-46 and 174-78). See also testimony of Hartzell at TR 207.

6

The Petitioner is bound by canons of the Pennsylvania bar as they relate to the keeping of fees and funds of clients. Under PA law, lawyers may treat fixed fees as monies that belong to the lawyer upon receipt of such a fee. See PA Ethics Opinion 95-100 (cited by the Director). This is a detailed treatment of retainers. As the opinion makes clear, there was some doubt about this issue, although the general practice in PA. had been to deposit refundable retainers into general operating accounts and this opinion allows for this so long as there is informed consent.

In that case, the money should be deposited in the attorney's general account and belongs to the attorney. The attorney is thus, indebted to the client to the extent that the value of legal services to be rendered in the matter did not equal or exceed the retainer paid.

The debt situation that results from a fixed fee, contrasts sharply with the generally accepted definition of a retainer where the money is placed in a trust fund to be billed against based on the attorney's time and hourly rate. Retainer agreements and trust funds are of course recognized in PA as in all other states and in these situations the money in the trust fund or escrow account remains that of the client until it is withdrawn. Monies from the trust fund are not withdrawn until earned which means until the work is performed. The retainer situation is sharply distinguished from a fixed fee

7

situation where the entire fee belongs to the lawyer upon receipt. Such fixed fee must be put in the attorney's general fund and to place such money in a trust fund would be an ethical violation because it would be commingling an attorney's money with client funds. In the case of a fixed fee where the work has not been performed, the failure to finish results in a debt situation where the attorney owes the client money. The debt is owed by the Petitioner out of his own funds, to the client. A debt in no way implies funds because funds are money that has been designated as such. Funds are treated separately under the ethical rules; they are segregated, they are subject to regular accountings, etc. All those things enumerated in 37 C.F.R. 10.112; viz: funds, securities and properties fit that description, they are held by the attorney but he does not own them.

A debt owed out of the attorney's money is different from property; it is not segregated, there is no reporting on it, etc. It is fungible it is part and parcel of his general account there is no specific identification of it other than it is part of his general fund that belongs to him.

In PA, the situation that results upon payment of a fixed fee is one of a debt where the attorney owes the client services, or owes the client a refund where the services are not performed or where the services performed do not equal or exceed the amount of the fee paid.

**III. 37 C.F.R. 10.112 itself did not create a federal law of property; rather, determining when money paid to an attorney is a client fund is one of state bar requirements.**

**1. Sperry v Florida leaves the definition of what is a fund up to the states, and the PTO rule is consistent as there is no PTO rule that defines a fund.**

Even if Sperry v Florida did not apply to this case there is nothing in PTO's regulations to suggest that all fees must be deposited into a trust account. The PTO rules simply refer to "fees" and "funds" without making any definitions, and hence it is up to the practitioner to determine this. Patent attorneys are not limited to practice only in their home state. As the practice of patent law involves strictly federal laws, patent attorneys are entitled to practice in any state and territory of the United States. See Sperry v Florida, 373 U.S. 379 (U.S. 1962). "Since patent practitioners are authorized to practice only before the Patent Office, the state maintains control over the practice of law within its borders except to the limited extent necessary for the accomplishment of federal objectives." Id. at 402.  As a practitioner under Sperry, the attorney is bound by his own state bar's ethical considerations as well by the Patent Office disciplinary rules as they relate to his practice "before the Patent Office." This limited extent of the Patent Office disciplinary rules is reiterated at 37 C.F.R. 10.1:

> "This part governs solely the practice off patent, trademark and other law before the Patent and Trademark Office. Nothing in

> this part shall be construed to preempt the authority of each
> state to maintain control over the practice of law except to the
> extent necessary for the Patent and Trademark Office to
> accomplish its Federal objectives..."

Thus the state bar authorities remain free to regulate the practice of patent

practitioners in terms of how he or she collects and deposits fees, advertises,

etc. as these practices are not necessary for the Patent Office to accomplish

its Federal objectives. In fact, many state bars have different sets of rues that

govern how fees are collected and deposited, and in many cases, these state

bar rules conflict with one another.

PTO's own written policy statements on the issue bear this policy out

where they take a hands off attitude to fee disputes and the details of the

actual contractual arrangement. See:

> "Fee Disputes. The Office will not resolve fee disputes. Such
> disputes involve contractual matters which are best handled in
> the courts. However, the Office will inquire, where appropriate,
> into allegations that fees are excessive or unreasonable.
> Normally, fee disputes arise because the client is uninformed
> about the details of the fees. A common mistake is for the
> practitioner to tell the client that he will obtain a patent for the
> client for X dollars, and then after the first office action, charge
> the client an extra Y dollars for an amendment. The client
> should be informed of all fees to be charged for preparing and
> filing the application as well as being informed of the
> approximate fees and costs which could be expected to be
> charged for consultations, amendments, appeals, interviews
> with the examiner, letters, and negotiating and preparing
> licensing agreements." (Petitioner's exhibit 1, p. 162).

This written policy (from a speech made by the former director Weiffenbach) reflects the concerns of Federal pre-emption doctrine that was held to apply in cases of patent attorneys in <u>Sperry v. Florida</u>.

Again, see Respondent's exhibit 1, p. 160:

> "The [PTO] code does not preempt the authority of each state to regulate the practice of law within its jurisdiction, except to the extent necessary to the for the PTO to accomplish its federal objectives. The Disciplinary Rules apply to attorney and agents practicing before the PTO in Patent cases as well as to attorney and grandfathered patent agents practicing before the Trademark Office. "

This language: "to the extent necessary to accomplish federal objectives..." is taken directly from <u>Sperry</u>. There is no reason for the PTO to take an interest in determining what is or is not a client fund subject to fiduciary considerations. Clearly all state bar associations have an interest in protecting their clients and the interest of general public is being protected by the state bars and their rules regarding trust funds. There is no Federal objective in regulating this area again.

Of course the PTO will be concerned when a fee is excessive or other ethical concerns are involved. <u>Sperry</u> in no way precludes the PTO from disciplining attorneys who commit such misconduct. Petitioner maintains that if a patent attorney did embezzle or

otherwise violate a fiduciary responsibility, the PTO does have
authority to discipline. However, what defines a client fund is still
up to the states under Sperry and it differs from state to state. Again
the PTO's own written statements say the same thing:

> "The PTO relied on the Federal preemption in adopting the
> PTO code. However, the PTO made every effort to minimize
> preemption of State control over the practice of Law. Thus 37
> CFR sec.101. second sentence, provides: [quoting] Nothing
> in..[these rules] shall be construed to preempt the authority of
> each state to maintain control over the practice of law except to
> the extent necessary for the Patent and Trademark Office to
> accomplish its Federal objectives. [end quote] This provision
> was based upon the language in Sperry v Florida and makes
> clear the PTO's intent to regulate only conduct related to or
> relevant to practice before the Office." [Respondent's exhibit 1,
> p. 163; Speech of OED Director Bovard "Jan.-Feb 1996."]

Nothing has changed since 1996. The PTO still has authority to
discipline practitioners who violate fiduciary responsibilities. Which fees
must be placed into trust accounts is regulated by state authorities and there
is no federal interest in creating such a law.

On redirect, the government expert insisted that the money in this case
must be placed in trust, reasoning that it had not been earned suggesting that
any unearned money must go into trust. TR 456. However the expert had
earlier admitted that in some states, some unearned money can go into a

general account, see TR 407. He then insisted that while a fee could go into a general account this was usually only done for large corporations.

Then the expert insisted that such a fixed fee can only go into a general fund with the "informed consent" of the client as if this was an additional requirement under the PTO rules, see TR 407. See discussion below at II b. 3 regarding the lack of an informed consent rule in the PTO regulations.

*Response to OED's post trial Brief.* The government contends on p. 57 of its post hearing brief, that Petitioner was given a 1992 notice regarding client funds. This letter has already been ruled out of evidence. See TR 474, et seq.

The PTO's own regulations allow for advances for expenses to be mixed into a general operating account. See: 10.112 (a) "All funds of clients paid to a practitioner or a practitioner's firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the United States..."[underlines mine].

Again this supports the notion that the states are left to themselves to regulate the practice of where an attorney places fees/monies received. The regulation quoted recognizes that many state bars have different rules about whether advances for costs maybe placed into a general account. This rule allows for this practice by certain attorneys in certain states. Again a recognition that how an attorney does business is up to state regulation.

13

**2. The PTO's regulations draw a distinction between fees and funds as do most or all other jurisdictions.**

There is nothing in the PTO's rules (37 C.F.R. 10.1 etc) or Ethical Considerations ("EC") that suggests that every fee that an attorney gets must be placed into a trust. The rules themselves distinguish between client funds (Rule 10.112) and "fees" which it mentions in Rule 10.40. It is hard to imagine that the drafters of the rules were so careless as to use two different terms to refer to the very same thing. In fact, if the words "fees" and "funds" were interchangeable, then there would be no need for rule 10.40 since every fee, including fixed fees, would not be covered by the word "fund" in Rule 10.112.

37 C.F.R. 10.40 says "A practitioner who withdraws from employment shall refund promptly any part of a fee paid in advance that has not yet been earned." Since 10.112 already covers funds and other property that belongs to clients, it is clear that 10.40 is covering all monies received from the client and not just client funds. If all the client fees received by a patent attorney had to go into trust under Rule 112 then there would be no reason for Rule 10.40; it would be covering the same thing; since "fees" are by necessity "funds" under that interpretation.

14

Sec. 10.40 also recognizes that there can be a fee that is property of the attorney but has not yet been earned; that is the debt situation described under ...... That situation is legal in many jurisdictions. The only reasonable reading of 10.40 is to acknowledge that this covers the situation where money might not be earned but yet is the attorney's property; and hence, not a "fund". When a fixed fee goes into a general account that is the way to describe the situation: it is money that belongs to the attorney although it has not yet been earned. It is money subject to a refund but not a fund.

The terms "refunds" and "fee" is used in 10.40 and it's not just coincidence. The term: refund is not used described the return of a fund because funds are client property, that situation is fiduciary and covered by Rule 112. It not a refund situation. That is a fiduciary situation; i.e. one of trust. A refund is used for money that is owed back to the client because of non performance of the contract and that is covered by Rule 40.

**3. There is no PTO rule about fee disclosures; nor is there any PTO rule about how to resolve fee diputes that is left up to the states to regulate.**

PTO's own expert admitted that there is no regulation in the PTO regulations that has to do with a fee disclosures or that Petitioner has to give a prior notice that he will deduct for his time when making a refund. (TR p. 461).

15

As has already been shown above, the PTO's own policy suggests that they will not help to resolve fee disputes per se. However, in so far as a fee dispute may reflect unfavorably on the practitioner, e.g. by not following his state rules about trust funds, then it might use that fact pattern to discipline.

*Re: How the dispute is resolved.* The Government's expert at first insisted that there needs to be some sort of discussion between the client and the attorney about the amount of the refund and whether it's fair suggesting there is a violation of the rules or EC if there is no such discourse.

> "...that conversation, that discussion never occurred and that's incumbent upon the lawyer by these rules and that did not happen Mr. Halvonik. " [TR 434; underlines mine.]

However,  after being pressed, the expert admitted that if a first refund check is issued and then another one for the full amount is sent later and the  "the fee dispute...is done in essence by sending another check in the full amount.." [TR 440] then there might not be a violation. TR 441. Clearly, there is no such rule in the PTO about how to resolve a fee dispute. Such matters are certainly within the ambit of state jurisdiction and the PTO has no interest in EXACTLY HOW the dispute is resolved; but rather whether the dispute was handled appropriately under that practitioner's state rules.

16

*Re: Informed Consent.* The government contends that a fixed fee can go into a general account only with informed consent, see p. 58 of their Brief to the ALJ. But their expert later admitted that the PTO has no rules about informed consent. TR 453, Again at TR 460-61 he admitted that there are no rules that that say what the attorney must disclose to the client up front in order to deduct from a refund. Despite previously saying otherwise, the expert admitted that if in his disclosure materials the Petitioner had not given notice to the client that fees would be deducted in a refund situation it would not be a rule violation. TR 442. The expert then admitted that there were no fee disclosure rules under the PTO regulations. TR 453.  Sprague and Chess had the fee situation explained to them and they understood it. See   TR p. 94-96

*Response to Government.* On p. 67 of the government's brief filed with the ALJ, citing <u>In re Anonymous</u> No. 114 DB 1998, 57 Pa D & C 4th 335 (2001), they claim that Petitioner violated PA Ethical Consideration ("EC") because the clients never received informed consent. In fact, Sprague was told upfront that the fee was a flat fee for the patent application. See TR p. 92. A flat fee arrangement was satisfactory to him as he had experienced both flat fee and hourly billing in his work and he had come to believe that flat fees favored the client. Thus Sprague was certainly informed of the

17

nature of the arrangement, he certainly understood what it meant from his own experience and he was satisfied with that. See Sprague at TR p. 94-96. Chess at TR 193-94, 207; 192-93; 206-08; 255-57.

Chess received the same set of paperwork that her husband received from earlier dealings with the petitioner and these explained the nature of the fee arrangement. The husband had previously had a fixed fee agreement with Petitioner and understood that and explained it to his wife when she went through the patent process with the Petitioner.  TR 193-94 and 207.Together they went over the materials. Chess said she got the materials, see TR 192-93. She asked her husband about the details and she understood the fee was to cover the filing of her patent application. See TR 206-08; 255-57.


**IV. Conclusion.**

The petitioner did not violate a fiduciary responsibility in regard to his placing of client funds in his general account. Nor was the petitioner ever under the impression that putting his fees into a general account was violating any rule, PTO or other, thus there was no willfulness involved. Nor does the petitioner's previous disciplinary case relied on by the ALJ in her opinion anything like this. Because the ALJ incorrectly concluded petitioner

had violated a fiduciary duty and because a violation of such duties are very

serious, the penalty in this case should be reduced.

BY: _____

Petitioner: John  P. Halvonik 2/18/09